at council table with me are my colleagues, Mr. Jack McKay and Ms. Donya Slim, both on the briefs with me. Your Honor, the decision of the District Court should be reversed for what I'm going to focus on for today's purposes. Two interrelated reasons. First, the District Court may have finding a fact that was clearly erroneous. Specifically, the Court found that after October 2, 2012, and all the dates that I'm going to refer to, which are very important, really are in September, October, November of 2012. The Court found that the debtor, which was the seller under the one and only asset purchase agreement, the APA that was signed by the parties, and CBE continued to treat their obligations as ongoing. That's in footnote 26 of the opinion. All the facts that were in the record before the District Court and are before this Court contradict that finding. What relevance does that have to the Court's ultimate finding? The relevance is the second point of error, which was the inability or unwillingness of the District Court to engage in the legal analysis, the at-law, not equity, analysis of repudiation. There's no repudiation analysis because there's no recognition... Where is there a repudiation argument in your brief? It is in both the opening brief and in the reply brief, and it's based upon cases of both repudiation cases of both the Virginia Supreme Court and the Fourth Circuit cases. Counsel, can I just, from one moment, it would be helpful to me if you just backed up. I'm trying to figure out where we are in the argument. So you are conceding that the District Court properly interpreted the agreement and that it required not only a default by the buyer, but also written notice from the seller on your part. There's no question here about the meaning of the agreement. Your argument is that that should be excused because it would have been futile in light of repudiation by CBE. Yes, exactly. Okay, but you are as one with the District Court on how to read the agreement, and you're talking about whether we should read into it an exception for futility when there's repudiation. Exactly. Our position is that the contract was consistently and repeatedly repudiated by the seller on October 2nd, on October 4th. Virtually every day that there was a communication during the month of October, the contract was repudiated by the seller. But didn't the parties keep extending the deadline for the deposit, and didn't those extensions say that the terms of the APA would continue to govern during that period? There were two very short extensions, the first of which was on the 5th of October, which carried the parties through this period. It just seems as though PSC was actually trying to make this deal happen. They weren't walking away from it. The seller? I can't remember. That the seller was just like the landlord in the whole land? This was ongoing. There were ongoing negotiations. Every one of those negotiations, as evidenced by the record, had absolutely nothing to do with the $20.3 million contract that had been signed by the parties. Counsel? I want to be sure I understand your answer to Judge Harris's question. As I understand your answer, you are conceding that the second and third questions presented in your brief were correctly decided by the district court. No. What I thought I heard Judge Harris ask is, do I agree that the asset purchase agreement has a provision in it that if we had gotten to a closing, in order for the seller to be entitled to the deposit at a closing, that a written termination notice would have been required? That I agree with. I don't think there's any way around that. That's in black and white in print. Was that conceded at the district court level and in the bankruptcy court? Pardon me, Judge? Did you concede that at the bankruptcy court level and at the district court level? It seems like that's what the case has been all about so far, how to interpret this agreement. So I have just a teeny bit of whiplash that now we're all agreeing on what the agreement means and we're down to this question of whether there should be an exception. That seems to be the specific question in your second question presented. The failure to issue a notice of termination. The district court erred in reversing the judgment when it held that the debtor failed to issue a notice of termination. The position of the appellant is that it was error for the district court to reverse, based upon the failure to submit a written termination because of, number one, repudiation. But you admit that the notice of termination was required. The contract states unequivocally that a notice of termination at a closing, in the event that the buyer doesn't perform its obligations at a closing, that a termination notice is required. We couldn't get to a closing because the buyer regularly, repeatedly, through the course of the month of October and even thereafter repudiated the contract. Could I just clarify? Are you saying that the terms of the contract simply didn't, were non-operative until closing? That the obligations of the contract did not control the behavior of the parties until they reached a closing? I'm trying to understand your argument. I'm trying to understand your argument that the repudiation has to do with enforcing a provision of the contract. The contract was never terminated. To this day, I don't believe the contract has been terminated. The contract specifically provides that for either party on a termination to be entitled to the deposit, that termination occurs when the closing doesn't occur at the closing. There's nothing in the contract that says you can issue a termination notice on October 2nd or October 15th. Well, when you read section 4.3.2, maybe I'm reading it incorrectly, it talks about if all the conditions to closing have been set and such party has not tendered performance of its closing obligations or deliveries here under on or before the closing date. It doesn't seem like it's restricted to the actual event of closing or that day. I read the failure event, I'm going to call it the default, may not have to have occurred. It could have occurred prior to closing. The way I read that is the default by the party could well have occurred before the closing, but the operative date for tendering the termination notice would have been the closing date. If all the conditions to closing required to obligate a party to close. Is it your position that 4.3.2 of the agreement only permits the notice of termination on or before, I mean on the closing date or after, that you're prohibited from sending it beforehand? It's my position that the contract does not provide, there's no express provision in the contract that says you can tender a termination notice prior to the closing. So that is my position on that. Can I ask you a question about your repudiation argument? I just want to make sure I understand it. So the contract clearly says there needs to be both the default and the written notice. So written notice is not futile in case of a default. Contract says you need both. If default isn't enough to render the notice unnecessary, why would saying that you're going to default be enough to render the notice unnecessary? There are cases, as I read them, Your Honor, which you seem to be juxtaposing as a concept, what does it take to repudiate versus what does it take to tender? I'm just saying there's all these cases saying that in cases of fact, situate contracts just like this, where what is required for some condition is both a default and notice. People always argue, so the notice is unnecessary. I've already defaulted. Who cares about the notice? And the court consistently says it is still necessary. It's not futile. It is exactly what is contemplated by the contract. And I am not seeing how we could get to a different result based on repudiation, which is simply saying I'm about to default. And here's why. I believe Your Honor is referring to, I think the lead case under Virginia Supreme Court precedent, is American chlorophyll. And under that line of cases, and I think there's only a couple of cases, but they're cited in CVEs, the parties to the contract were performing the contract. The parties to the contract, there was an ongoing expectation to the parties that each would continue to perform. And at some point there was a default under the contract. And what the court in that decision, the chlorophyll case found, was that issuing the notice was not a useless act because the alleged defaulting party, for example, would have a right to remedy the default. The parties could engage in mitigation of their investment in the contract. The parties could reset their expectations on a go-forward basis for the contract. So there were actual real-life reasons that would justify the issuance of the notice. There's absolutely no, there would be no purpose whatsoever served in the face of daily e-mails, daily letters, daily calls, financing proposals, none of which were in furtherance during the course of October, all received from CVE, none of which were in furtherance of the $20.3 million contract, all of which were in furtherance of potentially never entered into the $10 million and the $11 million contract that was sent over for review by CVE's counsel on the 4th of October, and then eventually a $15 million contract that was sent over well after the expiration of the, two or three weeks after the expiration of the last extension on the 24th of October. So is your argument that essentially the efforts to renegotiate the first contract amounts as a matter of law to repudiation of it? Sort of. My only nuance on that was there was never an effort to renegotiate the first contract. Just as Judge Gibney said in his denial of, in his decision on the motion to withdraw the reference, the first deal was aborted, and then, to footnote one of his decision, and then everything else after that were new efforts by CVE, the buyer, to renegotiate new deals. In fact, brand new draft asset purchase agreements were sent over by CVE to us on the 4th of October. There was never a, you know, here's the original contract. Let's try to revise and otherwise, I think, negotiate or renegotiate the first contract. We got new contracts, and then on the 24th, which is, again, well after the failure to provide the second deposit, we get a $15 million proposal. Even after the bankruptcy court approved the sale to the original competing buyer on the 6th, the hearings on the 6th of November, the order was entered on the 13th of November. Even after that, CVE filed a motion to set aside the sale order based upon a phantom $15 million contract. That's the basis for me saying there was regularly a repudiation, a refusal to comply in honor of the terms of the original contract. It never came back on the table. Just so I understand your argument, I understood your brief to be making the argument that there was a material breach, and under the Virginia material breach rule, that would leave your client of having to give the notice of termination. Do I understand correctly that you're not now making a separate material breach argument? Our argument is not steeped in material breach. Our argument is steeped in repudiation. Under the case law, there are two different things. The case that I would cite, that we did cite to, that I would cite the court to again, is the Homeland Training Center case, which was decided by a panel on which Judge Duncan sat. That is our case. If you read that case, it's this case. The landlord regularly, consistently, not just once, but regularly sent notice to the tenant that it was not going to perform under the contract. It's not like you can just repudiate and then fix it, and then ignore the subsequent repudiations. Even if the two short extensions, that is to do the supplemental deposit, from the 5th of October until the 10th of October, and then from the 10th of October to 12th of October, CBE then fails to supply the supplemental deposit under the original contract. At that point, you have a continuing, a whole new series of repudiations as a result of the hearings that took place before the Bankruptcy Court, where CBE was present, and we told the Bankruptcy Judge, we're not going forward with this transaction with CBE. We're going with the alternative purchaser. CBE never showed up at the Bankruptcy Court and said, no Judge, we're going forward with the $20.3 million contract. It never happened. Can I ask one very quick question on a separate point? It's about the money. The District Court thought that this money was available, that if the District Court is right and CBE is supposed to get the deposit back, the District Court said in footnote 10, and the money is available, but you seem to be saying that the District Court was wrong, that the funds are not available now and they were not available then. Where's the money? Do we have a mootness problem in this case? I don't really care where the money is, but is there a mootness problem? We do not have a mootness problem. The money is sitting in an escrow that's governed by Mr. Biss and myself. Great. Thank you. Thank you very much. Whenever you're ready, Mr. Biss. Good morning. May it please the Court. My name is Steve Biss, and I represent Chesapeake Bay Enterprises. Judge Harris, the answer to the concession that Mr. Potter made in response to your question, I clearly heard him concede that the District Court properly interpreted the contract. With that concession, that basically – You think that's the end of – I think that's the end of this case with that concession, and so my presentation this morning is going to be fairly brief. And I'll just say this. The District Court properly applied the right law. The District Court properly applied the right – In treating it as a material breach, which wasn't – That's how they treated it. Judge Harris, there's no difference between saying you're going to breach and breaching. And Judge Agee, this idea of it not being steeped in material breach, it being steeped in repudiation, I think is a distinction without a difference. Again, the District Court properly looked at this contract. As I pointed out in my brief, I call it a painstaking review. That's a lot of footnotes. In my experience with federal district courts, 26, 27 footnotes in a reported decision is a lot of footnotes. She took great pains to look at each and every one of the applicable contractual provisions and without having to say more, and with Mr. Potter's concession, the District Court got this one exactly right. And she was right when she said that CBE is entitled to the deposit. I'm glad that the court asked the question about where the money is. We've resolved that issue now, and so I would respectfully ask the court to affirm it to the United States District Court. Thank you. Just briefly in response, the repudiation argument, which under all the case law is different than a breach argument, there was no repudiation in the cases referenced by Judge Harris. If you look at all those cases, there's no repudiation. There's no repudiation analysis by the courts in those decisions. A repudiation is a clear and unequivocal statement by one of the parties to a contract that it will no longer perform any of the remaining obligations under that contract. As I'm reading your brief, and I may have missed part of this, it looks like to me you're making a repudiation argument only as a basis to say that we did not need to send the notice of termination. That's what I'm reading on page 13 in subsection C of your brief. Am I missing something? No, you're not missing anything, Judge. We did not need to send a notice of termination because there was repudiation. When a party to a contract tells you unequivocally day after day that they're not going to perform a $20.3 million contract, sending them a notice of termination is a futile act. Telling them they're not going to purchase our stuff for $20.3 million is a futile act. We've now had multiple hearings before the bankruptcy judge, multiple briefings before the district court, and now an opportunity to tell this court. It sounds like you're sort of back to the material breach argument there because under Virginia law, material breach would seem to operate much like repudiation in the sense that if you're not the breaching party, then the other party can't make you continue to perform under the contract, but that doesn't give you relief from following the provisions of the contract. Repudiation does, though. Under the Fourth Circuit precedents that exist that we've cited, which include the Holman contract. So this is governed by Virginia law. It is. So what case from the Virginia Supreme Court is your best case? Major and Price is the best case, I think. In Major and Price, there was a contract between the seller and buyer to purchase a piece of real estate between Ms. Major and Ms. Price. The contract specifically required the closing to occur for whatever reason in the 1930s, and there may well have been some significance attached to it, at a title company in Alexandria, Virginia. The purchaser noticed a closing in Arlington, Virginia, and let the seller know that the closing was going to occur there. The seller or the seller's agent refused, and the Virginia Supreme Court found repudiated the contract by refusing to sell the assets to the buyer under the asset purchase agreement. The seller took the position, no different than CBE here, that the contract says what the contract says what the contract says, you've got to comply with the contract. Virginia Supreme Court said no. No, not when you repudiate. It's not just a breach. It's not just one provision in the contract that section fill-in-the-blank. You've provided an unequivocally clear statement to the counterparty of the contract that you're not going to perform any of the conditions under the contract. The contract is, in the mind of one party, the repudiating party, dead. And what the Virginia Supreme Court precedents say, and what the Fourth Circuit precedents interpreting Virginia law say, is that the court is not going to allow the repudiating party to stand on ceremony, on a provision that has no meaning, in order to deprive the non-repudiating party, in this case my client, we didn't repudiate it. We're more than happy to sell the property for $20.3 million. We have a fiduciary duty to try to sell it for $20.3 million, which is why we bail on the earlier purchase or $10 million, and then when CBE repudiated the contract, we had to go back to the, we were forced back to the $10 million purchase contract. But the precedents cited in our brief, and the cases decided by both the Virginia Supreme Court and by this court, say that we're not going to allow the repudiating party to deprive the non-repudiating party of the benefit of a bargain based upon requiring them to do something that is of no moment. In other words, in the major and price case, the seller lost, and the buyer, who didn't close the transaction in Alexandria, but rather than sought to close it in Arlington, prevailed. We've had multiple hearings, multiple briefings. There's nothing in the record that shows that having tendered a termination notice at a closing would have had any different effect on the outcome of this case. Thank you. Thank you very much. We will ask the courtroom deputies to adjourn court for the day and come down and sign a die. And come down and greet counsel. This honorable court stands adjourned. Signs the aye. God save the United States and this honorable court.
judges: Allyson K. Duncan, G. Steven Agee, Pamela A. Harris